UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

KENNETH NEVOR, )
    Plaintiff, )
  )
  )
v. )   C.A. No. 13-407-M-LDA
  )
MONEYPENNY HOLDINGS, LLC, )
    Defendant. )
  )

## MEMORANDUM OF DECISION

Kenneth Nevor asserts a cause of action for negligence under the Jones Act, 46 U.S.C. § 30104 et seq., against his former employer Moneypenny Holdings, LLC. The Jones Act creates an affirmative duty for a seaman's employer to provide its employees with a reasonably safe place to work. The employer's duty to provide a safe boat is broad.

This Court may enter judgment following a trial without a jury. *See* Fed. R. Civ. P. 52(a). In crafting a decision following a bench trial, the Court "shall find the facts specially and state separately its conclusions of law thereon[.]" *Id.*[1]

After a four-day bench trial in September 2015 involving eight witnesses and numerous exhibits, and after a review of all depositions submitted as evidence, as well as the proposed findings-of-fact and legal memorandum from both parties (ECF Nos. 99 – 102), the Court makes the following Findings of Fact, Conclusions of Law, and Award.

---

[1] "When the evidence presented at a bench trial supports plausible but competing inferences, the court's decision to favor one inference is not clearly erroneous." *Torres–Lazarini v. United States*, 523 F.3d 69, 72 (1st Cir. 2008) (citing *Cape Fear, Inc. v. Martin*, 312 F.3d 496, 500 (1st Cir. 2002).

I. **FINDINGS OF FACT**

*Kenneth Nevor and Moneypenny Holdings, LLC*

1. Moneypenny Holdings, LLC is a Delaware limited liability corporation.[2] Moneypenny owns the *S/V Vesper*, a 52-foot state-of-the-art sailboat and the *M/V Odd Job*, a 35-foot Protector motor vessel.

2. Kenneth Nevor, 35 years old at the time of the incident, was a seaman employed by Moneypenny. The Court found Mr. Nevor to be a highly credible witness.

3. Mr. Nevor had been a sailor since he was eight or nine years of age, sailing dinghies as a boy. He turned professional in 1998 and moved to Newport, Rhode Island in 1999 to pursue professional sailing.

4. A majority of Mr. Nevor's sailing career was as a bowman, a mastman, a midbowman, and a grinder. He also worked on the foredeck.

5. Mr. Nevor distinguished himself in professional yacht races, serving as a crewmember on some of the industry's most distinguished yachts. He participated in regattas in the United States and around the world.

6. Mr. Nevor was involved in sailing at its top level. He advanced through many sailing vessels to get to this stage.

7. Mr. Nevor was conscientious, hardworking, and talented. His professional skills included sailing, racing, delivering, repairing materials such as fiberglass and carbon fiber, optimizing sailboats for racing, servicing a vessel's computers, electronics, rigging, mast tuning, winch break downs, and maintenance.

---

[2] James R. Swartz is a principal of Moneypenny Holdings, LLC. He was originally named as a defendant, but Mr. Nevor moved to dismiss with prejudice all claims against him. The Court granted the motion by text order on September 17, 2015.

8. Mr. Nevor first started sailing with the Moneypenny sailing team in the summer of 2007.

9. Moneypenny's *Vesper* sailing team was made up of highly skilled individuals and was very successful.

10. In the spring of 2011, Mr. Nevor became a member of the sailing crew of the *Vesper* in St. Thomas. He was scheduled to be a member of the crew at the next regatta in St. Barts.

11. The support vessel for the *Vesper* was the *Odd Job*. The *Odd Job* was a rigid inflatable vessel (sometimes referred to as the support vessel or tender to the *Vesper*) and had a hard, fiberglass deck and cabin, surrounded by an inflated rubber type "tube" made of hypalon. It had two 300 horsepower engines. The *Odd Job* was used to carry sails and equipment and was used for at-sea transfers of personnel from the *Vesper*.

### *The March 28, 2011 Incident*

12. The first official race for the *Vesper* took place in St. Thomas from March 24-27, 2011. The *Vesper* won that race.

13. On March 28, 2011, the *Vesper* team was moving the boat from St. Thomas to St. Maarten in preparation for the next regatta in St. Barts.

14. The crew of the *Vesper* consisted of Mr. Nevor and two others (one crewmember and one local man from St. Thomas who was not a member of the *Vesper* crew). This was not the usual professional race crew. No personnel transfer at sea was anticipated when the *Vesper* left St. Thomas.

15. Prior to leaving St. Thomas, the *Vesper* captain did not have the crew report to Customs in St. Thomas before sailing to St. Maarten. Instead, and presumably to save time,

*Vesper* Captain Jeffrey Price collected the passports from the crew and sent the *Vesper* to St. Maarten. Captain Price remained behind to deal with Customs.

16. Customs in St. Thomas, however, did not allow clearance with just the passports, but required the *Vesper* crewmembers to be in St. Thomas in person. This necessitated bringing the *Vesper* crew back to St. Thomas to return to Customs.

17. The *Odd Job* was sent to get the *Vesper* crew to take them back to St. Thomas for Customs clearance.

18. If clearance via Customs had been done properly before Mr. Nevor and the other crew left St. Thomas, there would have been no need for an at sea transfer.

19. The transfer of the *Vesper* crew to the *Odd Job* occurred somewhere east of St. Thomas and St. John in the open waters of the Caribbean Sea. It was in an area known as Sir Francis Drake Channel. There are barrier islands to the south. To go on to St. Maarten, the boats would have to pass through one of the cuts between these barrier islands. The distance across this area of the sea, from island to island, is approximately ten to twelve miles.

20. When the *Odd Job* reached the *Vesper*, both vessels were moving under power and oscillating up and down with the sea. The *Odd Job* approached the left side of the *Vesper*, putting the right side of the *Odd Job* along the back left side of the *Vesper*.

21. The breeze was building at the time of the incident, causing the sea to become choppy. The winds were at least 8-12 knots, and came from the east over the *Vesper*'s right side, causing the vessels to pitch.

22. The wave action caused the height between the two vessels constantly to change beyond the variance of the hull heights. There was at least a one and one-half foot difference

between the heights of the two boats to begin with regardless of wave or ocean action. Both boats were moving independently and separated with a gap appearing between the vessels.

23. The two boats could have safely sailed to calmer waters in order to conduct the personnel transfer, but they chose not to do so.

24. The crew did not tie the two boats together and the captain did not require it.

25. In effect, the crew had to jump from the *Vesper* to the *Odd Job*.

26. There are safety procedures that all the professional sailors should follow that Moneypenny's agents did not follow. The captain of the boats gave no instructions or safety procedures to the crew and there were none in place.

27. The transfer at sea was made with less than a full crew. This greatly increased the already inherent risk of a transfer at sea, especially in choppy waters.

28. As Mr. Nevor was attempting to make the transfer, the vessels separated. Mr. Nevor slipped on the *Odd Job* tube, clinging to the lifeline of the *Vesper* to save himself from plunging into the water. The *Odd Job* ultimately came back to the *Vesper* closing the gap and Mr. Nevor fell into the *Odd Job*.

29. Mr. Nevor's bicep was torn from the bone in his right upper arm when it got hung up on the lifeline of the *Vesper*.

30. The *Odd Job* returned to St. Thomas with the crew so they could clear Customs. Mr. Nevor then went on to St. Barts, the site of the *Vesper's* next race.

31. Mr. Nevor asked to sit out the St. Barts' race because he was injured. His superiors, who had just won a race in St. Thomas, decided he was needed on the vessel at St. Barts so denied his request. Mr. Nevor complied with the order and sailed two practice days

and one race day in St. Barts. After that, Moneypenny removed Mr. Nevor from the crew because of his injury and he traveled home to the United States for medical treatment.

### *Medicals*

32. Mr. Nevor suffered from a right distal bicep tendon tear. Surgery was conducted on May 2, 2011, with an L-shaped incision over the front part of Mr. Nevor's elbow and forearm. The torn tendon was located and manually pulled back into its normal position. The surgeon then reattached it to the bone via anchors that he imbedded into the bone.

33. Because of the surgery, Mr. Nevor experienced great pain and a yearlong period of recuperation and therapy. Mr. Nevor wore a cast for a week or more. Then he wore a brace for 10 weeks, with a compression sleeve to reduce swelling.

34. Mr. Nevor treated with Dr. Andrew Green from the time of the surgery in May until November 2011. Dr. Green referred Mr. Nevor to physical therapy for six months.

35. Dr. Green opined that by September 23, 2011, Mr. Nevor's job requirements on a racing yacht "would be beyond what I would think was safe." When Dr. Green saw him on November 15, 2011, he found mild atrophy of the bicep muscle and stated that Mr. Nevor was not capable of performing his regular job duties on a racing yacht.

36. Mr. Nevor's right arm had not regained its full strength by the end of physical therapy. His tendon repair was somewhat tighter than usual and, once reattached to the bone, Mr. Nevor's arm would not straighten out.

37. Mr. Nevor was not capable of working as a grinder on a sailing boat while Dr. Green was treating him.

38. Mr. Nevor has a permanent scar of about two and one half inches in length on his right forearm from the surgery.

39. Dr. Elie Cohen, a board certified orthopedic surgeon, examined Mr. Nevor on two occasions and found him to have a complete tear of the bicep tendon in his right arm with a retraction of the tendon. Dr. Cohen described Mr. Nevor's surgery and recovery as painful.

40. Dr. Cohen saw Mr. Nevor in January of 2012 and concluded that Mr. Nevor was unable to do his prior work as a crewmember at that time because of a loss of strength in his right arm due to the injury.

41. Mr. Nevor's condition is not expected to improve and his injury and scarring are permanent.

The Court makes additional findings of fact relating to Mr. Nevor's arguments on his Jones Act and general admiralty claims.

### *Negligence*

#### a. Failure to have an adequate number of crew members

42. There were only three persons on the *Vesper* and only three persons on the *Odd Job*. This was not the usual professional race crew because they were not anticipating making an at-sea transfer.

43. There were insufficient crewmembers to safely conduct a personnel transfer at sea under these conditions.

44. The Court finds that the inadequate number of crew members at the time of the transfer rendered the vessel unseaworthy and this condition played a substantial part in causing Mr. Nevor's injuries.

### b. Failure to move to calm waters for transfer

45. Transfers at sea are very high-risk maneuvers for many reasons, specifically considering the wave and oceanic motion. Even the most competent crew has difficulty performing transfer procedures safely.

46. The rough sea, producing a one to three foot chop due to increasing winds, caused both vessels to move erratically and contributed to there being a height variance between the vessels as the *Odd Job* pulled up next to the *Vesper*. The crew intended for the *Odd Job* to come into contact with the *Vesper* to steady the boats, but the movement of the sea caused the vessels to separate at the time Mr. Nevor attempted to transfer.

47. The *Vesper* could have moved to calmer waters (e.g., between barrier islands), which would have made the transfer safer. There was enough time for the waiting *Vesper* to move into the lee of any nearby island where the water was calmer, resulting in a safer place to transfer.

48. By not moving to calmer waters when that option was available and remaining in a choppy sea, Moneypenny was negligent, did not provide Mr. Nevor a safe place to work, and played a substantial contributing part in causing Mr. Nevor's injuries.

### c. Failure to tie the two vessels together prior to transfer

49. Typically, vessels are tied off during boarding procedures to remove the gap that will open up between the vessels due to the action of the sea. Requiring crewmembers to jump into the transfer boat without tying off is not reasonably safe, is negligent, and constitutes an unseaworthy condition in this case.

50. The *Odd Job* and *Vesper* were not tied off prior to executing the crew transfer, contributing to the unsafe work conditions. At least one line should have been run from the

*Vesper* to the *Odd Job*. The captain of the *Odd Job* could have turned off the boat's engines, further reducing the risk during transfer. The line would have held the vessels together, eliminating any gap that occurred between them. No lines were used to hold or tie the two vessels together. In failing properly to secure the vessels, Moneypenny was negligent, did not provide Mr. Nevor a safe place to work, and played a substantial contributing part in causing Mr. Nevor's injuries.

### d.  Failure to apply a non-skid product to the slippery tubes

51.  A substance had been applied to the tubes of the *Odd Job* to protect them from sunlight. However, this substance makes the tubes slippery, especially when they get wet. These tubes are where a seaman will normally place his or her feet during a transfer and when they become unreasonably slippery, the vessel can be considered unseaworthy.

52.  A readily available non-skid product comes in rubber sheets and is often adhered to rigid inflatable tubes to make them less slippery. The cockpit floor and foredeck of the *Odd Job* did have rubber non-skid, but there was none on the tubes. A non-skid material should have been applied to the tops of the *Odd Job* tubes as they are used as a walkway during transfers. Failing to use a non-skid material on the tubes that Defendant knew would be slippery made the *Odd Job* unseaworthy and substantially contributed to Mr. Nevor's injuries.

### e.  Failure to provide proper training procedures

53.  Moneypenny did not establish any safety procedures on the *Vesper* and *Odd Job* to ensure a safe transfer at sea.

54.  Moneypenny did not provide any crewmember training about how to conduct a safe personnel transfer at sea. While it assumed that professional sailors would know how to transfer, failing to have transfer protocols and safety procedures was negligent. Failing properly

to train its employees and to have implemented proper safety procedures made the *Vesper* and *Odd Job* unseaworthy and substantially contributed to Mr. Nevor's injuries.

### f. Conclusions of Fact on Liability

55. Based on the facts presented at trial, the Court finds that Moneypenny and its agents had a duty to provide him with a reasonably safe place to work. Moneypenny breached the duty of providing for the safety of the crew. Mr. Nevor was injured because Moneypenny failed to furnish him with a reasonably safe place to work, and his working conditions could have been made safe through the exercise of reasonable care. Moneypenny was negligent because it and its agents acted in a manner that a reasonably prudent person would not or failed to act in a manner that a reasonably prudent person would, under the same or similar circumstances. The negligence of Moneypenny was the actual and proximate cause of Mr. Nevor's injuries.

### g. Contributory negligence

56. Mr. Nevor exercised the degree of care for his own safety that a reasonably seaman would exercise in like circumstances.

57. In following the order to transfer vessels without the benefit of any safety procedures set forth by Moneypenny, Mr. Nevor was not contributorily negligent in transferring between the *Odd Job* and the *Vesper* in the manner he did.

### *Damages*

58. Mr. Nevor's quality of life has been dramatically reduced. He has permanent scaring, has endured severe pain and suffering, and will continue to suffer from occasional pain.

59. Mr. Nevor has sailed his entire adult life and planned to continue to be a professional sailor until he could do it no longer. There are people working at sea and who are captains who are in their sixties.

60. Mr. Nevor cannot return to his prior level of sailing at elite racing events around the world due to his injury. He cannot return to his previous occupation as a crewmember on a boat doing heavy or hard work because his lost arm strength is a threat to the vessel or other crewmembers.

61. Michael LaRaia, Mr. Nevor's vocational expert, holds a master's degree in Vocational Rehabilitation Counseling and personally examined Mr. Nevor. The Court finds Mr. LaRaia to have been a credible witness.

62. Mr. LaRaia determined that Mr. Nevor held valuable, diversified skills as a professional sailor. His opinion was based upon Mr. Nevor's work history in the sailing world, and information gleaned from other professional sailors and sources.

63. The *Vesper* boat series is the upper echelon of competitive sailboat racing and the *Vesper*-racing program is one of the highest-profile racing programs in America. Mr. Nevor would have continued to be employed in high-level sailing and he would have advanced as a professional sailor in his chosen field if he had not been injured.

64. Mr. LaRaia's opinion was that, conservatively, Mr. Nevor could have made $120,000 for nine-to-ten months sailing each year, and that Mr. Nevor, like other sailors, could have been employed in this field into his sixties. The Court accepts this opinion as credible, appropriate, and reasonable.

65. Mr. Nevor grossed $40,125 for three months at the start of 2011, the year in which he was injured.

66. Advanced America's Cup sailors make as much as $25,000 per month. Mr. Nevor would have reached this level if he had not been injured.

67. Dr. Dana Hewins is a forensic economist, who holds a bachelor's degree in economics from Tufts University, and a master and doctorate in economics from the University of Illinois. He engaged in post-doctoral studies in economics at Harvard. The Court finds Dr. Hewins to have been a credible witness.

68. At the time of his injury, Mr. Nevor was 35 years of age. He has a working life expectancy of 30.3 years. Dr. Hewins noted that since Mr. Nevor is a college graduate this number should be "a year or two higher."

69. Mr. Nevor's tax returns indicate that his income from sailing was steadily rising.

70. Mr. Nevor was being paid at the level of a captain or manager of a racing vessel. His duties and role on the vessel were commensurate with that occupation.

71. In 2011, if Mr. Nevor had not been injured and had been able to complete the year, he would have earned an income of $120,000 to $160,000.

72. This amount is reasonable when the Court considers the fact that Moneypenny Holdings LLC paid managers and captains amounts including $155,350 and $117,124 in 2011; $117,124 and $111,850 in 2012; and $144,560 and $103,500 in 2013. *See* Plaintiff's Exhibit 24.

73. Dr. Hewins testified that Mr. Nevor's net loss of earning capacity because of the injuries he incurred on March 28, 2011, reduced to their present value, was in the range of $710,458 to $852,549. The Court finds this testimony to be credible, reasonable, and appropriate.

74. In addition to lost earnings, Mr. Nevor suffered extensive physical and emotional pain because of his injury. His recovery from the surgery was long and painful. His daily

activities and interests are limited due to his injuries. He is scarred permanently. Mr. Nevor has lost strength in his arm that he will never regain. He no longer can work in his chosen profession and therefore suffered a great emotional and economic loss.

## II. CONCLUSIONS OF LAW

1. This Court has jurisdiction over this case pursuant to general maritime law, 28 U.S.C. § 1333 and the Jones Act, 46 U.S.C. § 30101 et seq.

2. Mr. Nevor's Jones Act claim creates an affirmative duty for a seaman's employer to provide its employees with a reasonably safe place to work. *Mitchell v. Trawler Racer, Inc.*, 362 U.S. 539 (1960).

3. Both the *Vesper* and the *Odd Job* are vessels in navigation as they have been employed in the context of the Jones Act.

4. Mr. Nevor was a member of the vessel and therefore was a seaman entitled to protection under the Jones Act.

5. "A plaintiff's burden of proving causation under the Jones Act is 'featherweight.' Liability exists if the employer's negligence contributed even in the slightest to the plaintiff's injury." *Toucet v. Maritime Overseas Corp.*, 991 F.2d 5, 10 (1st Cir. 1993) (citations omitted).

6. Under the Jones Act, "[n]egligence is doing an act that a reasonably prudent person would not do, or failing to do something that a reasonably prudent person would do, under the same or similar circumstances." Fifth Circuit Pattern Jury Instructions (Civil Cases), § 4.4 (2014).

7. "Employers of seamen have a duty to provide their employees with a reasonably safe place to work. If . . . Plaintiff was injured because Defendant failed to furnish him with a

reasonably safe place to work, and that Plaintiff's working conditions could have been made safe through the exercise of reasonable care, then ... Defendant was negligent." *Id.*

8. This Court finds that Moneypenny was negligent in that it failed to provide Mr. Nevor with a reasonably safe place to work, and that it could have, and should have, made his working conditions safe through the exercise of reasonable care. Specifically, the Court finds that:

   a. Moneypenny did not adequately staff the *Vesper* in order to perform a safe transfer at sea;

   b. The captains of the *Vesper* and *Odd Job* did not appropriately stabilize the two vessels (e.g., by tying them to each other) in order to perform a safe at sea transfer;

   c. The captains failed to bring the vessels to calmer and safer waters before conducting the personnel transfer, and failed to provide a safe method of ingress and egress from the vessel;

   d. Moneypenny failed to have appropriate non-skid surfaces on the tubes of the *Odd Job*; and

   e. Moneypenny failed to have proper safety procedures in place and failed to properly train personnel concerning at sea personnel transfers.

9. Moneypenny's defenses that the transfer at sea is part of the job of racing boats, that the transfer at issue in this case was done the same way it was always done, and that an experienced seaman like Mr. Nevor, who had done many similar transfers before, should have asked for assistance if he needed it, are not supported by the facts, credible testimony, or the law.

Moneypenny also argues that Mr. Nevor's injury was caused by his own negligence in failing to safely maneuver between the vessels. The Court rejects each of these assertions.

## III. AWARD

The Court finds that Mr. Nevor is entitled to an award of $710,458 for loss of earnings and loss of future earning capacity and an award of $750,000 for pain, suffering, and mental anguish. The total award of damages to Mr. Nevor is $1,460,458.

## IV. CONCLUSION

The Court awards Plaintiff Kenneth Nevor $1,460,458 plus interest and costs against Defendant Moneypenny Holdings, LLC. Mr. Nevor should prepare and submit a form of judgment. Moneypenny's Motion for Judgment in Partial Findings on Count for Unseaworthiness (ECF No. 88) is DENIED.

IT IS SO ORDERED:

_____
John J. McConnell, Jr.
United States District Judge

Date: January 14, 2016